Good morning. May it please the court, Mark Adams on behalf of Jose Rodriguez-Arroyo. This case presents a very unusual circumstance in that Mr. Rodriguez-Arroyo first came to the United States. He first entered as a resident alien sponsored by his mother and stepfather at age 17. Graduated from Benjamin Franklin High School in Highland Park here in Los Angeles. And then he enlisted and honorably served in the United States Marine Corps from July of 1975 until June of 1981. He served in Vietnam, Hawaii, and finished his career at Camp Pendleton. He did suffer several service-connected injuries in connection with that service, including back injuries, injuries to his feet. And he was diagnosed with post-traumatic stress disorder, with which he's still afflicted, as noted in the pre-sentence report. Unfortunately, these service-connected disabilities led to drug abuse, alcohol abuse, family problems, homelessness, and his treatment at the Veterans Administration facility here in Los Angeles. He suffered criminal convictions because of those problems. The first, amazingly, he did not suffer until 1990 at age 35. And those convictions ultimately led to a 1994 removal hearing where he was granted cancellation of removal, given his family circumstances, the fact that he had two United States citizen children, his mother here in the United States, his father here in the United States, and he was married. In 1998, after suffering an additional conviction, he was first actually removed, and he lost his resident alien status. It's now conceded that that was a flawed proceeding, given a notice problem. There was a reinstatement. And then finally, on August 9, 2005, the deportation hearing that we're challenging here today, we maintain, is also flawed, in that the immigration judge did not individually advise Mr. Rodriguez of his eligibility for voluntary departure. He summarily denied voluntary departure. He did not advise Mr. Rodriguez. I mean, the IJ did take particular care with your client. I mean, he made a general statement advising the group of availability of voluntary departure, and then I think made it clear that if anybody had a claim or equities that go to that, they should state them when they are addressed individually. In your client's case, he specifically addressed your client individually. He noted his status as a veteran, and I would even say try to bully him a little bit, or push him a little bit towards postponing rather than being deported immediately. I thought he was fairly aggressive in suggesting that, but ultimately your client, who obviously is quite fluent in English and not some of the usual problems you have with wondering whether the translator got it or the communications broke down, he's obviously quite fluent. And he said, no, I've got problems in Mexico. My father's quite ill. He's dying.  I want to be deported. I find your client very sympathetic. I mean, anybody who fought and bled for our country is certainly entitled to one or several measures of extra leniency and deference, but I have some difficulty finding that this IJ did not give him due process. I'm just not. I understand, Judge Kaczynski, and I think you're right. I know you're right. I'm right about what? Did the IJ ever mention voluntary departure? He mentioned it at the very beginning. Let me finish my sentence. I'm asking you a question. Did the IJ ever mention in the individual meeting with your client where he tried to push him in the right direction, did he ever mention voluntary departure? No, sir. Okay. But he did mention it when he asked the question generally. He advised the group, and he did say, if you have any equities in this regard, talk to me about that. If you have any equities, yes. He said to him if you have equities. He knew the equities, that he was a Marine. He knew all about his problems, but he never asked him whether he wanted voluntary departure. He did not individually ask him. In fact, he never mentioned the word voluntary departure. True. And then he ruled and denied a motion for voluntary departure, which was never made. Okay. Even though it's obvious to the IJ that voluntary departure would be a real benefit to him. A serious benefit and would have afforded Mr. Rodriguez what he really wanted was to get released that day so that he could attend to his dying father. It was very clear from the interchange, the individual interchange between the IJ and your client, that what your client was interested in was getting to Mexico to see his father and to do so quickly. Immediately. And had he been granted voluntary departure, which could have happened at that very hearing, he would have been on his way right away. And do we know for sure that he was eligible for voluntary departure? Well, we know that he has many equities, yes. And he mentioned those equities even during the individual exchange with the immigration judge. Now, I'm not sure how much importance to attach to this, because I think the IJ may have been speaking imprecisely, but the IJ did say in his general statement, not the individualized statement, but his general statement, we also, I guess we is the royal we, we also want to mention to you that the law authorizes voluntary departure in each of your cases. Now, whether he means you have a right to it, each of you, or whether there's just a general authorization for a voluntary departure if you qualify is a little less than clear. But there certainly is no, nothing in this record that suggests to me that he probably was not eligible for voluntary departure. True. The other infirmities that I think afflict this particular. Could the IJ have adjudicated a voluntary departure right there? I believe he could have. And in fact, I think the request has to be made. I don't know. He said this is just an arraignment. Doesn't, are you an immigration lawyer at all? No, I'm not. You know, I don't know what happens, whether the governments come in and dig up dirt and, you know. Yeah, and I don't know. You know, you're really not entitled to a voluntary departure because you, I mean, if somebody, for example, I'm not saying this of your client, but let's say, for example, somebody turns out to have a record of being a sex offender or, you know, a child molester, you know, something of that sort. I assume the government or the immigration, I guess it was called INS at the time. Yes, sir. It's not called something else, would be able to come in and say, no, he's not entitled to voluntary departure because, look, he's got this record, right? Right. And I don't know if they would have had his immigration file, which is called the A file, there before them. But in that file, they would have had a number of records, including the records from the 1994 cancellation of removal hearing. There were letters from family and that sort of thing that were in the file. It was. But we don't know whether they had them there. We don't know. And we certainly don't know whether or not in the normal case, again, the INS would get a chance to dig around and see whether there's any. Because not everything gets into the A file, right? True. I mean, the guy could be out there, you know, doing something else. They don't, the state authorities don't figure out he's an alien or don't bother to notify the INS. And he has a record somewhere. So it's entirely possible that adjudication of the voluntary departure was taking much longer than the deportation. In order for you to prove a due process violation, I don't think you have to show here that he was, in fact, eligible for voluntary departure or would have been granted it on the spot. I think it's a lesser showing in terms of prejudice. What's the what's the showing of prejudice that you need to show for your client in order to get a due process violation? I agree. Your Honor, I think that we have to show here that there was a probability. He had a reasonable probability that he would be able to demonstrate eligibility for voluntary departure. But you have to show a little bit more than that. You have to be sure that he would have been willing to seek that equity if, in fact, it caused him delay or would have delayed his return. It's true. But here, also, the immigration judge did not alert Mr. Rodriguez to the consequences of the removal. He did not disabuse him of this mistaken notion that he could reapply after some five years, even though he said that he wasn't sure that that was correct. Really, the consequences were going to be much more severe of the removal order being put in place. Yeah. Now, it's a little unclear in the individualized exchange what's actually in the head of your client, because the judge is saying, well, I'm not so sure your lawyer has it right. The judge, I think, probably was stating that generally. I think what he really meant, your lawyer is a moron. But your client recites that the lawyer said, listen, you go away, you wait a little while, and you can come back. So he apparently had, your client apparently had some notion in his head as to what he was going to be able to do that was just wrong. And so when he said, please deport me now, I think he was relying on the information he'd gotten from his lawyer, which was wrong. Which doesn't tell me then what he would have done had he really known about the availability of voluntary departure and the real consequences of having it or not having it. So his saying, I want to be deported now, in the context of the hearing as it took place, I don't think it tells us that if he'd been informed of voluntary departure and the possibility of delay, I don't think that tells us that he would say, listen, I don't want voluntary departure. I want to leave now and suffer the adverse consequences of being deported without voluntary departure. I think you're right, Judge Fletcher. I don't think we know what he would have done had he been properly advised. Although he was very insistent. But it's your burden, isn't it? It's your burden to show that he was denied due process and therefore that this prejudice and that, you know, whatever that jaded prejudice, part of that showing seems to me is to show that, in fact, he would have tried to get voluntary departure. Well, I think if he'd been properly advised by the immigration judge, if he'd been individually advised in counsel that he had this right to voluntary departure, the judge could have perhaps told him, we can't do it today, but we can do it tomorrow. Let's get you back to your father. Do you know whether they would have done it that day? I do not know. Well, then stop supposing things that you don't know, particularly when they're disadvantages to your client. No, I asked him the question. But he doesn't know the answer. Well, we're maintaining. Well, don't assume things that you don't know when you answer the question. Yes, sir. We're maintaining the 2005. For example, you know, the question Judge Kaczynski asked you about the burden when he said it's more probable. Probably. Yes. He said the test is plausible. Yeah. For the due process. It's a much lower test than Judge Kaczynski asked you about. But you're so agreeable that you always agree and say, yes, that's it. And as you know, the denial of the voluntary departure was done that day. They didn't wait to find out any more facts. They're quite capable of granting or denying and generally do at the close of the hearing. Well, all we know is that they. Well, we've heard a lot of other cases. Is that denying that he denied a motion that had not been made? True. So from the government. Thank you. Good morning. Please support. My name is Douglas Keene with the United States Attorney's Office in the Southern District of California. I'm appearing for the United States in this matter. The tragedy of this defendant's case is not decreased by the fact that the defendant was advised of every entitlement to which he was warranted that day. It's still a tragedy. The fact that the defendant was advised. You mean he was advised in the group hearing, not advised when it was an individual exploration of what he wanted? As to his eligibility for voluntary departure, that's correct, Your Honor. He was advised in the group setting. What it appears is that the court set aside these aliens, all of whom had been determined or the court believed were eligible to apply for voluntary departure, and heard them all at once. So the I.J. statement was then not imprecise. There had already been a determination that he was eligible for voluntary departure? That's what the record indicates, Your Honor. Yes, I'm pleased. That the defendant was eligible? The I.J. considered the defendant eligible for voluntary departure. In other words, that means then there wouldn't have been a delay if he'd asked for it. The government wouldn't have come in then and said, oh, you know what? I need to explore this guy and find out whether, in fact, he's a sex offender or whatever. Apparently it was understood after your saying it was understood at the time and the I.J. understood he's eligible. All he has to do is ask for it and, I guess, post a bond or whatever other things are required. I apologize if I misspoke, Your Honor. The I.J. states that all of those defendants or all those aliens were eligible to apply for voluntary departure. But there are two places in the record that indicate that the I.J. believed that if they were to ask for voluntary departure or any other form of relief, some further hearing would have been warranted. Now, where's that? On pages 24 and 25, I believe, of the excerpt of the record, the judge is enumerating the admonitions that he's giving to the different members or the different aliens that were present at the time. Okay, I've got this. Would you put my nose in the language? And he said he's numbering out the things that he wants to talk to them about. And the paragraph begins, fifth, if during the course of the hearing it appears that you qualify for some demerit. Okay, wait a minute. I'm on page 25 of the E.R.  Where should I be? I believe it's page 24, Your Honor. 24, okay. Fifth, okay, I'm sorry. Okay, now I'm with you. Okay. If during the course of the hearing it appears that you qualify for some benefit under our immigration laws, we will explain what the benefit is, provide you with an appropriate application for you to complete if necessary, have someone help fill out the application, and there's an unintelligible portion. We'll refer you to another judge who will give you an individual hearing. Yes. On the following page. Well, in the following paragraph, he says, we also want to mention, in other words he's now talking about something different, that the law authorizes voluntary departure in each of your cases. So that doesn't sound as though this next paragraph when he says we also want to mention that he's talking about, well, we'll give an individualized hearing and fill out an application. Well, the judge is referring initially because it's part of the same paragraph, it's fifth. He says we're talking about. Well, when he says fifth, it appears that the judge is reading off an enumerated list. So in the paragraph that begins fifth. I'm talking about paragraphing in front of me. Oh, I'm sorry. But I'm just talking about the word also in the sentence we also want to mention, which is when he starts talking about voluntary departure. Prior to that time, he's saying, well, you can get some benefits and you might have an application. We also want to mention voluntary departure. Now, I recognize that this sort of general talk, we may not be able to rely as sort of as fully as we would as sort of fully carefully drafted document. I understand that. But this suggests that voluntary departure is just available for everybody there without further action, without this sort of fill out an application. It suggests. I can't be sure. And the court's entitled to make that conclusion. The way we're reading this, I think the most, the clearest reading for the government is that the court is saying you're all eligible to apply for voluntary departure. The court mentioned several other times in the same admonition that it does not have the files present, for example, on page 25 of the excerpt of record. I think it's the third paragraph down. Although we do not have a complete file giving us this information, the attorney for the agency has information based on your fingerprints, et cetera, and he's admonishing you to be candid and so on. He mentions on, I believe it's page 26, if you want more time to prepare for the hearing, please stand and we will accommodate you and postpone your hearing. It appears that the court is saying you are eligible to apply for voluntary departure. He says in the paragraphs of the court that Your Honor just cited right now on page 24 that voluntary departure doesn't speed up your removal or deportation. The court seems to be indicating this does not necessarily guarantee you're going to leave today, but there are serious benefits to voluntary departure, and you are eligible to apply for voluntary departure. Your Honor, I'd just say I'm very sympathetic both to the I.J. and to the defendant here. The I.J. is not trying to hurt this guy. On the standard of harmlessness in order to show due process, I think the standard is plausible, and ordinarily it's plausible legal ground. Does the plausibility also extend to plausible that he would have asked for it? I'm glad Your Honor identified that, because that also would go, if we reach that point, to the issue of prejudice, and the standard is plausible. Did you raise prejudice in your brief? Prejudice wasn't raised in neither of the briefs, Your Honor. Well, they don't have to say it. But you did not allege or contest, contend that there was no prejudice in your brief. Because the I.J. That's correct, Your Honor. Because the I.J. identified that the defendant was eligible for voluntary departure, and the standard is plausible, did he have a plausible likelihood that his application would have been considered? I think that's certainly fair to say. I don't think that the record indicates that the judge did, in fact, interpret any request for voluntary departure. The evaluation of the equities may have been for some other purpose. Why did he deny the application for voluntary departure? I may be at a loss, Your Honor, but I'm not aware in the record where the court said he was denying an application for voluntary departure. Oh, it's in the order. It's page 74 of the excerpts in the removal proceedings order of the immigration judge. First item, the respondent was ordered removed from the United States to respondents to blank. Then something is checked. The next item is checked. Respondent's application for voluntary departure was denied, and the respondent was ordered removed to Mexico. There was, in fact, no application, was there? That's correct, Your Honor. And there is the form is a standard form. It was not individualized for this defendant other than as to the location of his deportation. And that standard form states that an application for voluntary departure was denied. And there was a cross mark next to it that that's what happened. Correct, yes. That was the selection that the immigration judge entered. That is true. So that's wrong because there was no application. He denies voluntary departure, but it's wrong in the sense that there was no application. The judge engaged in no individual colloquy with regard to voluntary departure with the defendant. It has no indication that the defendant made an application for voluntary departure having been advised. That's correct, Your Honor. So he's denying an application that wasn't made. Yes, that seems to be correct, yes. On the face of the deportation order, that's what the judge indicated. I'm sorry, Your Honor. Do you think this is a case which might be resolved in mediation? Well, it's difficult because what the defendant is asking for is permission to enter the United States. Yes. Subsequent to his 2005 deportation, the complexity or the complexion of his immigration status has changed. He's committed further crimes since then. It would be very difficult for him to be granted permission to enter the United States at this point in his criminal career. Are those further crimes to which you're referring? Are those on the record before us? They were the crimes for which he was convicted. Oh, the crimes that are now at issue in front of us right now. Well, there's only one. He was convicted of two crimes. One was unlawful entry into the United States, violation of 1326, but also of section 911, which is making an oral false claim to U.S. citizenship. Under the Immigration Code, that actually results in a complete bar to entry. Someone who falsely claims to be a United States citizen, when they're asking for benefits to which a citizen would, in fact, be entitled, when they're not really results in a lifetime. Well, it doesn't matter really, I just ask, whether you thought this is something that might be resolved. And if you say there's no hope, no chance of resolving it, that answers that question. The defendant does have an application, an N-400 application, which would have been the application for a veteran that would have ideally been brought prior to all of this pending. I don't know the status of that application, but we certainly have no objection to him bringing that application. Unfortunately, that's as far as I can say. I can't speak for the Immigration Service. Okay, thank you. To answer, and if I've answered your question, Your Honor, I can- No, you've done a nice job of answering. I've got one further question. I think I know the answer to it, but I want to push against it just a little bit in any event. If he had been granted voluntary departure, it's pretty clear that one of his two convictions would be set aside. It's not at all clear that his conviction about lying about U.S. citizenship would be set to one side. On the other hand, if he'd been granted voluntary departure, I'm not sure he would have told the lie. But maybe that's just the way it then falls out, that he told the lie, and that's the end of it on that question. Part of the tragedy of the case is we're left to speculate about a number of things, and not least of which the Court observed is even if he had been offered, specifically individually offered voluntary departure in an individual setting, which the law didn't require, but if the Court had done that, it is not clear from the record that the Court believed that forms of relief were available at that hearing. It's not clear to the contrary either, but there are indications that the Court felt that some further adjudication was going to be necessary if any form- No, no, I understand. Because he said he didn't have the- So if the defendant who had wanted to leave that day to be immediately repatriated to Mexico, if that was what he was looking to accomplish that day, even if he had been advised, you can also ask for voluntary departure, records suggest that he would have declined that as well. We don't usually have that information on the record. We don't typically have aliens who are so adamant about leaving the United States as we do in this case. I also suggest that he thought that he was going to be able to come back in after five years because his lawyer had told him he could. And the immigration judge told him that was not true, said, I don't think that's true. The immigration judge didn't quite say that. The immigration judge indicated his skepticism. And to a sophisticated listener, that means the immigration judge thinks he's dead wrong, but that's a sophisticated listener. That's not necessarily this man. Not necessarily the defendant. And the judge did say, I don't want to second-guess your attorney. He was giving his attorney the benefit of a doubt, which perhaps is not warranted. Do you know anything about the lawyer that he had? Not present counsel. Present counsel has done an admirable job, believe me. No, no, I'm not talking about that. But this was obviously sort of a group arraignment situation. Was this a lawyer that was appointed? The attorney to which the defendant was referring to at the time? Yeah. No, I'm not aware of. I'm not even aware if he actually even had an attorney. He may have. There are people called licensures in Mexico who claim to give immigration. Notarios. Right, yes. Notorious Notarios. Yeah. And I just don't know. It's another one of those areas where we're forced to speculate, and it could go any number of directions and only magnifies the tragedy. If the Court has no further questions, then I will submit in our written briefing. Thank you. I think you're out of time. We should have a minute for rebuttal in May. I'm here to submit, and I don't know if there are further questions. No, okay. Thank you. Thank you. Thank you very much. Thank you. Well, next, here are your amendments. This is Walt Disney.
judges: Kozinski, Reinhardt, Fletcher